**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **DRAGA CAIRONE,**<br>**Plaintiff**<br><br>**v.**<br><br>**McHENRY COUNTY COLLEGE, TALIA KORONKIEWICZ, in her official and individual capacity as Manager of Student Conduct and Campus Life, McHENRY COUNTY COLLEGE TONY MIKSA, in his official and individual capacity as Vice President of McHENRY COUNTY COLLEGE, FLECIA THOMAS, in her official and individual capacity as Dean of Student Affairs, McHENRY COUNTY COLLEGE JULETTA PATRICK, in her official and individual capacity as Title IX Coordinator, McHENRY COUNTY COLLEGE**<br><br>.<br>**Defendants.** | ) | **No. 17 cv 4247**<br><br>**Hon. Robert Dow, presiding**<br>**Magistrate Judge Young B. Kim** |

**JURY TRIAL DEMANDED**

**AMENDED COMPLAINT**

Draga Cairone, plaintiff, complains under that the McHenry County College and its administrators, specifically Talia Koronkiewicz, Tony Miksa, Flecia Thoms, and Juletta Patrick (the MCC defendants or the defendants), (1) violated her civil rights under to procedural and substantive due process 42 U.S.C § 1983, (2) to nondiscrimination and failure to reasonably accommodate under the Title II of the Americans with Disabilities Act, 42 U.S.C § 12132, and (3) breached their implied contract with Ms. Cairone under Illinois State law.

They committed these unlawful acts, first, by subjecting Ms. Cairone to the following sanctions: suspending her from McHenry County College for a year, banning her from campus for that period, requiring her to re-enroll, requiring her to provide, on her reapplication a "personal statement," undergo sexual harassment training, and describe what she could do personally to "show or encourage" the negative effects of sexual harassment," apparently with respect to what "unwelcomeness" means, among other things. These are only consistent with a sexual harassment finding that was never actually made. Ms. Cairone was found to have committed "harassment" –an nonexistent offence–and *punished* for ***sexual*** harassment, which she was not found to have committed, despite the MCC's Student Code of Conduct (2014-15 ed.) (the Code) defining "discrimination and harassment" as being conduct "***based on***" the victim's membership in protected groups (Code, Art VI, Sec. C (prohibiting "discrimination and harassment based on sex, race, ethnicity, religion, age, [and other protected groups in MCC] admissions, employment, educational programs, or activities. Ms. Cairone was not found to have harassed anyone because of their membership in any group, protected or to have committed haradssment "based on" sex, sexual orientation, or any protected group characteristic. She was found guilty of free-floating "harassment" unmoored from any protected classes, an offense that does not exist under the Code.

The defendants violated Ms. Cairone's procedural due process rights and Illinois contract rights under the Code in imposing these sanctions, illegally abrogating her liberty and property interests in the continued "peaceful pursuit of education; and to the reasonable use of College services and facilities" rights "recognized" by MCC (Code, Art. I) and her liberty interests in pursuing *any* occupation of her choice (not any *particular* occupation) by finding that she committed "harassment," thereby casting doubt on her reputation in such a manner that it is

virtually impossible for her to find employment. These deprivations of contractually based property and liberty interests granted by a state institution were made initially without specific allegations and required an appointment with disciplinary officer Talia Koronkiewicz within two days, not required *meaningful notice*, and imposing sanctions on her on June 3, 2015 (the Sanctions Letter) without giving her an opportunity to be heard, in violation of rights contractually conferred by the Code (Art. IV: "Any student facing possible disciplinary action is entitled to the following procedural rights: []to be notified in writing of the charges against him/her, []to know the nature of the evidence against him/her, []to present information and witnesses relevant to his or her defense. . . ."; *see also* Art II, ¶ 1("No disciplinary action shall be initiated nor any sanction imposed against students or student organizations until they have been notified in writing of the charges against them and their rights under this Code, and given the opportunity to be heard."))

The sanctions involved sanctions for *sexual* harassment with which she was not charged, in violation of her substantive procedural and substantive due process rights. The defendants further violated her procedural due process rights by ***banning her from campus*** from June 11, 2015, on, while directing her on June 23, 2015, to prepare a defense for her appeal of the finding and sanctions, initially scheduled for July 29, 2015 (ultimately held on Aug. 12, 2015), without her being able to interview witnesses or and gather evidence on campus, effectively and unlawfully prevented her from being adequately heard. A letter of Aug. 6, 2015, acknowledged the rescheduled date and gave her *one day* to submit witnesses, while still be banned from campus, making a mockery of the Code's own contractual guarantee of the right "to present information and witnesses relevant to his or her defense." The SAB Hearing Decision, issued by Koronkiewicz on Aug. 20, 2015 (SAB Letter), upheld the finding and sanctions, repeating the

procedural and substantive due process and contracts violations involved, including imposing sexual harassment sanctions without any determination of harassment *on the basis of membership in a protected group* (such as sex), part of the Code's definition of harassment (Art VI, Sec. C., above), as does Vice President Tony Miksa's final affirmance of the SAB decision and sanctions (Miksa Letter), dated Sept. 11, 2015, after Ms. Cairone's appeal.

The defendants further intentionally discriminated against Ms. Cairone on the basis of disability and failed to reasonably accommodate her, in violation of the ADA and the Code's own contractual commitment to disability non-discrimination and reasonable accommodation (Art. VI, Sec. C, referencing the ADA). It thereby perpetrating a continuing violation against Ms. Cairone, who has autism, by intentionally discriminating against her because of disability and failing to offering her accommodation, first in the initial determination of Code violations and imposition of sanctions, and second, in subjecting her to sanctions for alleged behavior arising in substantial part from her disability, while not sanctioning non-disabled students for similar conduct. In doing so, MCC also breached its contract with Ms. Cairone not to subject her to disability discrimination.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action under 28 U.S.C. § 1331 because it arises under 42 U.S.C. § 1983 and the ADA, 42 U.S.C § 12132. *et seq*. Supplemental jurisdiction for state law contract claims exists under 28 U.S.C. § 1367 because the complained of conduct arises from a common factual nexus. Venue in this District is proper, because all or a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois. 28 U.S.C. § 1391.

**FACTUAL AND PROCEDURAL BACKGROUND**

2. Draga Cairone is a student at all pertinent times involved here enrolled in McHenry County College (MCC).

3. MCC is a county institution of higher education operated by McHenry County.

4. Ms. Cairone had a contractual relation with MCC partly embodied in the Student Code of Conduct giving her certain rights and responsibilities detailed throughout this Amended Complaint.

5. Ms. Cairone is disabled, diagnosed with autism, a result of which is that she is extremely literal-minded and cannot read body language, understand sarcasm, or detect lies.

6. She is also a transgender MtF woman. This is not a disability.

7. MCC has been aware of Ms. Cairone’s disability (autism) since 2009, and has it on record.

8. In 2009, 2012 and 2013, Ms. Cairone was subject to student discipline. The 2009 decision involved exclusion from campus for three months and require therapy on the supposed basis that Ms. Cairone had been suicidal. In 2012 and 2013, Koronkiewicz offered Ms. Cairone the option of submitting documentation as part of a request that records relating to these disciplinary actions and the sanctions themselves be expunged. Ms. Cairone submitted these requests and documentation. Available records of these incidents contain no reports or other evidence of suicidal ideation, but only that Ms. Cairone was nonverbal, nonresponsive and curled up in a fetal position. In or around 2013, Koronkiewicz verbally told Ms. Cairone that these findings and sanctions were made in error because their basis were autistic “shutdowns” not suicidal ideation, and had been expurgated from her record. In Miksa’s Sept. 11, 2015, Letter upholding the findings and sanctions here in dispute, he stated that such expurgation was not and

could lawfully be done. In 2010, after Ms. Cairone sued MCC over this incident, MCC established a rule that suicidal ideation was not a valid basis for discipline.

9. The 2012 and 2013 incidents involved prohibitions on future attendance *as an MCC student* of meetings of the Midwest conference of LGBTQ persons because of allegations of breaking curfew or going unattended after curfew hours in supposed violation of a field trip contract. In the field trip contracts for 2012 and 2013, there are no clauses imposing a curfew or requiring chaperones after any particular time. Ms. Cairone was punished for violating contract provisions that did not exist.

10. On or around May 11, 2015, Ms. Cairone received notice to meet with Koronkiewicz, the campus official then in charge of student discipline, to discuss "possible violations of the [Code]." She was given ***two days*** to prepare for this meeting. She was not given any further information about what the violations were supposed to be.

11. Koronkiewicz had been investigating and documenting allegations of Ms. Cairone's supposed inappropriate behavior in the student lounge (the "Belly") since at least May 1, 2015. These allegations involved claims of nonconsensual touching, unwanted physical closeness, and shaking the bottom of her bra cups (the "boobie dance") in ways that made other students uncomfortable. Koronkiewicz reported statements from three student informants but not from a fourth who attended the meeting at which Koronkiewicz took notes about Ms. Cairone's alleged behavior.

12. Koronkiewicz said her informants said that that no one confronted Ms. Cairone because she is "dramatic and makes people feel bad." They said that some who did not like Ms. Cairone's alleged conduct left without saying anything so as not to make Ms. Cairone feel bad. They also said Ms. Cairone would "nestle," "cuddle" or "lie on" other students "without asking." One

interviewee said that Ms. Cairone was "always touching her [the interviewee]" and the interviewee would always tell Ms. Cairone to stop.

13. On all occasions, Ms. Cairone distributed written or digital consent forms (the "contract") for other students to sign, explaining her cognitive limitations and asking for consent to touch or to engage in other intimate behavior that might call for consent. She would talk about the contract with people with whom she wished to interact. When someone declined to sign, she would not engage in intimate behavior with those students, except one intimate then-friend, Brandon Marciel. The point of these forms was to ensure she had express consent.

14. Koronkiewicz interviewed Ms. Cairone on May 13, 2015. Koronkiewicz's notes state that they "discussed" Ms. Cairone's "excessive contact without asking." The notes do not report any admission of such touching. The notes say that Ms. Cairone told Koronkiewicz that Ms. Cairone touched her breast in the "boobie dance" for medical reasons, not as a sexual provocation. The notes say that Ms. Cairone has "asked if people want to see her bondage gear, but no nudes." The notes report that Ms. Cairone said that her "friends have told her she may be unethical and now [she] doesn't know if she understands consent." The notes say that Ms. Cairone admitted to knowing that her conduct made people uncomfortable but she said she had learned that people do not tell her this. The notes also say she wrote a phone text in which she discussed another student [name redacted] as "the object being cut up [with a sword] at a party," which was, they say, intended as a joke and was inappropriate.

15. These statements in the notes are largely false, incomplete, and misleading. Ms. Cairone did say that "boobie dance" was done for medical reasons and not for any sexual purpose. Ms. Cairone told Koronkiewicz that the dance, done fully clothed, was a prophylactic for breast cancer and not a provocation, and this activity had a scientific medical basis. She stated that a lot

of women students at MCC do this without getting in trouble, so she thought it was OK. Ms. Cairone told Koronkiewicz that she asked other student's consent to see photos of her "gear," but not of her wearing the gear, clothed or not, in part because no such pictures existed. She explained to Koronkiewicz that this inquiry was an attempt, sometimes successful, to gain consent. When consent was denied, she did not show pictures of her gear. Ms. Cairone did report that people in the Belly told her she might be unethical, but that she disagreed with that evaluation. Ms. Cairone did *no*t tell Koronkiewicz that she did not understand consent, but told Koronkiewicz that she, Ms. Cairone, did not understand *revocation* of consent if it was not verbal or written and express. Ms. Cairone did not "admit" knowing that her conduct made people uncomfortable without their telling her this, but rather acknowledged Koronkiewicz that told her this at the interview. Ms. Cairone always obtained express consent for any such interaction, either orally or writing or by text. Ms. Cairone did not tell Koronkiewicz that she had discussed cutting up a student with a sword, but had responded to an instance of Brandon Marciel's repeated comment to that he wanted to kill or injure that student, by inquiring about that student's name (over text) to express incredulity and disapproval.

16. Between May 13, 2015, and June 3, 2015, Koronkiewicz gave Ms. Cairone no notice or warning that she was facing charges of harassment or any specific violations of the Code.

17. In the May 13, 2015 interview, Koronkiewicz told Ms. Cairone, "you need to learn to read body language. Everyone else can, so can you. If you can't you can't receive or give consent."

18. At the May 13, 2015, interview, Ms. Cairone asked Koronkiewicz that she be interviewed by an advisor or person with knowledge of and expertise in autism so that the disciplinary board could have the benefit of advice and appraisal by someone who had professional knowledge of

Ms. Cairone's disability. Two days later, on May 15, 2015, Koronkiewicz rejected the proposed accommodation without proposing any alternative.

19. On June 3, 2015, Koronkiewicz issued an official Sanctions Letter (the Letter) stating that after a "due process meeting" with Ms. Cairone and others, after which the MCC "disciplinary body," including Flecia Thomas, Koronkiewicz's superior, and Juletta Patrick, determined that Ms. Cairone had "violated the [Code], Art. I, Sec C, harassment, in particular because she had supposedly *admitted* to engaging in a sexually provocative "boobie dance" without consent, "[l]aying [sic] on top of and cuddling others without their consent," and "asking others to see pictures of [Ms. Cairone] in bondage."

20. Both the allegations of the conduct detailed in the Letter and statement that Ms. Cairone had admitted to any wrongdoing or the specific acts alleged are false. As noted in ¶ 14, Ms. Cairone's "boobie dance" was not sexual in nature but medical and was done by many other women students. Ms. Cairone has never lain on top of or cuddled with anyone without express consent. Ms. Cairone never asked anyone to see pictures of her in bondage, and in fact there were no such pictures, but only permission to show pictures of gear, which she never did unless permission was granted.

21. The Letter did not find that Ms. Cairone had engaged in *sexual* harassment, expressly defined in the Code as a form of discrimination: "unwelcome conduct of a sexual nature which denies or limited [sic], on the basis of sex a student's ability to participate in . . . College[] programs . . . " (Code, Art. IV, Sec. C.) Neither did the Letter find that Ms. Cairone had harassed anyone *because of* sex or *on the basis of* any other protected group membership or characteristic. See *id.*

22. The Letter imposed on Ms. Cairone the following sanctions: a one year suspension and ban from MCC starting June 11, 2017, requirements requiring her to provide, on a reenrollment reapplication, a "personal statement," ***undergo sexual harassment training, and describe [in the personal statement] what she could do personally to "show or encourage" the negative effects of sexual harassment."*** She was advised she could file a notice of intent to appeal by June 17, 2015, which she did.

23. Sometime before June 17, 2015, Ms. Cairone requested, as an ADA accommodation, that counsel be allowed to speak on her behalf at the Appeals hearing to be scheduled. One June 18, this request was rejected, but she was allowed to have an advisor, not an attorney, speak on her behalf.

24. On June 24, 2015, Koronkiewicz gave Ms. Cairone a letter dated the previous day, setting July 29, 2015 as the hearing date with a deadline of July 1, 2015 [possibly a typo for July 15] to provide a witness list and . to provide by July 15, 2015 at 9 a.m an oral statement and copies of all documents Ms. Cairone was submitting to support her appeal. Ms. Cairone was banned from campus, so she could only gather material remotely. She did not make the 9 a.m. deadline. Koronkiewicz emailed her at 9.30 to say that the deadline had passed. Ms. Cairone wrote Koronkiewicz back to say that her witnesses had not been contacted, and she therefore requested an extension. Koronkiewicz replied that she had spoken to one of them in May and that the statements of three people would be included in MCC's record of evidence (the "Packet"), but they would not be allowed to testify. The hearing was rescheduled for Aug. 12, 2015, and held on that date.

25. MCC gave Ms. Cairone the Packet containing the case against her to be considered on appeal on Aug. 10, 2015, ***two days before the appellate hearing***.

26. The Packet contained the witness statements cited above in ¶¶ 11, 12, 14, and 15. It also contained two interviews "written" by Koronkiewicz, on July 15, 2015. In these, one witness stated that they believed that Ms. Cairone "acts appropriately" and the witness has never witnessed any nonconsensual touching. The other stated that Ms. Cairone stopped touching and apologized when asked to cease physical contact that had become unwelcome, and that other students had said that Ms. Cairone's touching and comments made them, uncomfortable, but they had not told her. The witness thought that these people gave Ms. Cairone nonverbal cues, which , as the witness stated they believed, do not work with someone autistic.

27. The Packet also contained a record of the incidents from 2009 and 2012, see ¶ 7, in a section in following a heading entitled "Relevant Student Conduct (Chronological Order)." Neither of these involved harassment or discrimination and their relevance was not explained until invoked in Miksa's final denial of Ms. Cairone's appeal in the Miksa Letter, Sept. 11, 2015.

28. After the appellate hearing, the Student Appeals Board (SAB) issued a Decision, signed by Koronkiewicz, dated Aug. 20, 2015, upheld the finding and sanctions. The Decision stated that violations of the Code were wider than sexual harassment and included "harassment." The basis of the decision was Ms. Cairone's supposed admissions, on May 13, 2015, of physical contact without consent and being told by friends that her behavior *may* be unethical, as well as supposedly saying she was not sure if she understood consent. The SAB Letter treated "harassment" as a free-floating violation independent of differential treatment because of membership in a protected class despite the clear language of the Code, Art. VI, Sec. C.

29. The Decision also stated that Ms. Cairone admitted to knowing that her behavior made some people uncomfortable but also that she said she had learned that people do not tell her this. The Decision noted that Ms. Cairone stated at the hearing that she always had consent for any

physical context. The Decision referenced statements by a complainant and three student witnesses, which "corroborated" her "admissions." It did not cite any standard of review, which according to the Code is "preponderance of the evidence." (Code, Art. IX, § B(12)). Each of these statements, except that Ms. Cairone always obtained express consent, is false. See ¶¶ 15 and 20 above.

30. At or after the SAB hearing Koronkiewicz, when Ms. Cairone's advisor at the hearing asked whether Koronkiewicz was "judge, jury, and executioner," stated that Flecia Thomas and Juletta Patrick also participated in the initial decision before the June 3, 2015 Sanctions Letter, to find that Ms. Cairone had violated the Code and to impose the specified sanctions.

31. Ms. Cairone appealed both the finding and the sanction to Vice President Tony Miksa because under the Code, the Vice President makes all final decisions about student discipline. In the Miksa Letter, dated Sept. 11, 2015, he upheld the Decision and its findings and sanctions, including the sexual harassment sanctions. Miksa stated again that Ms. Cairone was found to have committed "harassment," not sexual harassment. Miksa credited the witnesses relied on by Koronkiewicz and reasserted her findings of purported facts. Miksa asserted that the findings were made on the basis of a preponderance standard not mentioned in the SAB Letter.

32. The sanctions based on "harassment" included findings of "prohibited conduct" including "a broad range of verbal, nonverbal, and/or physical behavior," which the SAB and Miksa in their respective letters treated as independent of the Code's prohibition on "discrimination and harassment based on sex, race, ethnicity, religion, age, [or on membership in other protected groups"].

33. Miksa upheld the severity of the sanction on the basis of the record of the incidents from 2009 and 2012, see ¶ 7, following a heading entitled "Relevant Student Conduct (Chronological

Order)," that Miksa states would be considered only in the case of a finding of a violation of the Code, Art. VI, § C (harassment based on protected group status), which was not made. See ¶ 33 *et passim*. In violation of procedural due process and Ms. Cairone's contract rights, the incidents from 2009 and 2012 had not been discussed with Ms. Cairone in the 2015 case and she had no notice or opportunity to be heard on their use in these deliberations.

34. In 2017, after the present lawsuit was filed, , MCC issued an email directive to MCC faculty instructing them not to provide references or letters of support as representatives of MCC for Ms. Cairone in connection with student disciplinary proceeding against her at University of Illinois.

**LEGAL PRINCIPLES AND CLAIMS**

35. Ms. Cairone's Section 1983 rights to procedural and substantive and due process arise under the Fourteenth Amendment to the U.S. Constitution.

36. The gravamen of Ms. Cairone's procedural due process complaint is, first, that she was not given "the touchstones of procedural due process," *Simer v. Rios*, 661 F.2d 655, 677 (7th Cir. 1981) (class action context) before being found guilty of "harassment" in the June 3, 2015 Letter. She was told only that she was being interviewed regarding unspecified possible code violations, not what these were or that she faced charges potentially leading to sanctions. This is not notice. She was given ***two days*** to prepare for the interview without being told about what or what was at stake and was not given an opportunity to defend herself or otherwise be heard when before the Letter was issued on June 3, 2015. The pattern was repeated, among other times, when Ms. Cairone's was given MCC's Packet containing the case against her ***two days*** before the SAB hearing.

37. Second Ms. Cairone was not given substantive due process when MCC imposed sanctions on her punishing her for sexual harassment, requiring her to take a class on sexual harassment and address the issue in a personal statement when she was, on inquiry and challenge, repeatedly told, in the SAB Decision and Vice President's Ruling, that she was not being found to have committed sexual harassment.

38. Ms. Cairone had property and liberty interests contractually based in MCC's Coode continued "peaceful pursuit of education," to pursue some occupation of her choice without baseless and procedurally defective damage to her reputation," and constitutional rights in the due process clause as well as contractual rights in the Code to notice and an opportunity to be heard. MCC violated her rights on all counts.

39. Third, Ms. Cairone was not given *substantive* due process because the evidence was insufficient, including claims of admissions that the evidence shows she did not make and which MCC officials ***admitted*** she did not make, but deemed her to have made, anyway. Most importantly, it found her guilty of an offense, "harassment," that ***did not exist*** under the Code, a sort of "harassment" unmoored from anything directed at anyone based on membership in a protected class, and MCC punished her with sanctions for ***sexual harassment,*** an offense which MCC twice expressly found she has not committed.

40. The named individual defendants directly participated in these violations in their individual and official, Koronkiewicz and Miksa by imposing or upholding sanctions, Flecia Thomas, Koronkiewicz' supervisor, and Juletta Patrick, bymeeting with Koronkiewicz and jointly make the initial findings and impose sanctions.

41. As officials or administrators of MCC, the named defendants were carrying our MCC policy in making and upholding the complained-of findings and imposing and upholding the sanctions.

42. No reasonable university official or administrator would have thought it lawful to make findings of Code violations without putting the subject on notice or giving them an opportunity to be heard. The Code itself is clear and the fundamentals of constitutional procedural due process are clearly established federal law. Likewise, no reasonable University official or administrator would have thought it lawful to find a student guilty of offenses that did not exist (harassment unconnected with group membership) and impose sanctions on that student for *sexual harassment* when they had expressly determined she had not committed sexual harassment. Qualified immunity, therefore, does not apply.

43. Ms. Cairone's ADA rights not to be intentionally discriminated against and to reasonable accommodation were violated when Koronkiewicz, knowing of Ms. Cairone's disability and that it would likely lead to damaging misunderstandings of the sort set out in rejected her request at the meeting of May 13, 2015, to be interviewed by a psychological professional with knowledge of autism, and proposed no alternative accommodation. This is not time barred because it is part of a continuing violation. A continuing violation is a claim based on an ongoing policy. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-18 (2002).

44. The imposition of sanctions for the behavior Ms. Cairone found to have committed was itself disability discrimination, and a continuing violation. At May 13, 2015, meeting Koronkiewicz intentionally discriminated against Ms. Cairone because of her disability by telling her she had to "learn to read body language" because "everybody can," inconsistent with the psychological limitations of autism, denying against her knowledge of Ms. Cairone's

diagnosis on record and expressly acknowledged by her after the 2009 incident, that her autism substantially limited her in her everyday life functions.

45. Koronkiewicz together with Thomas and Patrick, and ultimately Miksa, then intentionally discriminated against Ms. Cairone again by sanctioning her for behaving in an autistic manner. Since the sanctions remain in effect, the violation continues. All of the conduct alleged as disability violation, even that before June 5, 2015, is actionable because it is a continuing violation. In the alternative, any time-barred allegations of disability discrimination and failure to accommodate are evidence of actionable discrimination inside the limitations period.

46. As specified below, Ms. Cairone seeks permanent injunctive and declaratory relief for damages to her good name and reputation caused by defendants' actions in the form of an (a) order to defendants to have the findings and sanctions vacated, the records of the proceedings sealed, and (b) a declaration from the court that defendant's actions were unlawful. These unlawful actions detailed in this complaint have caused her irreparable harm for which she has no adequate remedy at law, and she will suffer more harm, absent requested relief than MCC and the named individual defendants would suffer by denying such relief, who would suffer no harm by such relief. The public interest would be served having plaintiff's name cleared and rights protected.

47. In all the Counts below Ms. Cairone realleges and incorporates all prior paragraphs by reference as though stated in each count.

**COUNT I.**

48. Ms. Cairone was deprived of her procedural due process rights by not being given notice of the charges (or that there were charges) against her before the June 3, 2013, Letter and a

meaningful, or any, opportunity to be heard before that letter and the Aug. 12, 2015 hearing and subsequent affirmance of the sanctions

**COUNT II**.

49. Ms. Cairone was deprived of her substantive due process rights when she was punished for sexual harassment that she was told in the Letter, the Decision, and the Ruling that she was not charged with or found to have committed sexual harassment.

**COUNT III**

50. Ms. Cairone was deprived of her substantive due process rights when she was found to have committed harassment on the basis of insufficient evidence that the defendants acknowledged did not exist.

**COUNT IV**

51. Ms. Cairone was discriminated against because of disability when she was found to have violated the Code and sanctioned because of characteristic autistic behavior and told by Koronkiewicz, in effect, to stop being autistic or acting in the way autistic people do, and thereafter by having the findings of Code violations and the impositions of sanctions upheld on appeal.

**COUNT V**

52. MCC breached its state law contract with Ms. Cairone by the unlawful conduct set forth in the specified counts.

**COUNT VI**

53. MCC retaliated against Ms. Cairone for filing this lawsuit by issuing a directive prohibiting MCC faculty from providing Ms. Cairone with letters of support in her proceedings before the University of Illinois in 2017.

## DAMAGES

54. Ms. Cairone suffered emotional distress and humiliation because of these violations as well as irreparable injury for which there is no remedy at law to her reputation, good name, and economic and educational prospects.

## ATTORNEYS AND EXPERT'S FEES

55. Ms. Cairone requests that reasonable attorneys and experts' fees and costs be paid by the defendants, under 42 U.S.C. 1988 (b) & (c) if she is the prevailing party.

## PRAYER FOR RELIEF

56. Ms. Cairone demands:

a. $250,000 in noneconomic damages for emotional distress and humiliation due to defendant's unlawful actions.

b. $250,000 for damage to her reputation, good name, and present and future educational and employment prospects.

c. $250,000 in punitive damages for intentional violation of clearly established federal rights to procedural and substantive due process of which any reasonable university officials or administrators would have known and of intentional violations of her rights not to be discriminated against because of her disability, failure to reasonably accomm0datye her, and retaliation against her for exercising her rights to pursue relief for these wrongs in court;

d. A permanent injunction directing defendants to vacate the findings and sanctions from any records and seal any records of the proceedings.

e. A declaration that defendants' actions in the MCC proceedings against her were unlawful.

f. and such other relief as this honorable Court deems just and necessary.

| Nov. 13, 2017 | ss/_Justin Schwartz<br>Justin Schwartz<br>Counsel for Draga Cairone, Plaintiff<br>ARDC No. 6257328<br>1723 W. Devon Ave #607882<br>Chicago, IL 60660<br>847-687-5477<br>justinschwartzlaw@gmail.com |
|---|---|
| | |